FILED

DEC 0 2 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JURY
ACTION

JASON D. IVARONE )
4950 Brenman Park Drive, #302 )
Alexandria, Virginia 22304 )
                                               )
        Plaintiff,                             )
                                               )
                v.                             )
                                               )
JOSEPH FRIEND )
7732 Goodfellow Way )
Derwood, Maryland 20855 )
                                               )
        Defendant.                             )
_____ )

CASE NUMBER  1:05CV02322

JUDGE: James Robertson

DECK TYPE: Personal Injury/Malpractice

DATE STAMP: 12/▉/2005

RECEIVED
NANCY M.-WHITTINGTON CLERK
DISTRICT COURT OF COLUMBIA
DEC -2 PM 5: 44

## COMPLAINT

1.      This is an action at law arising out of defamation *per se* of plaintiff by the defendant, JOSEPH FRIEND.

## PARTIES

2.      Plaintiff Jason D. Ivarone ("Mr. Ivarone") is a resident and citizen of the Commonwealth of Virginia.

3.      Joseph Friend ("Mr. Friend") is a resident and citizen of the State of Maryland. Mr. Friend was at all times materially hereto a managerial employee of CACI International, Inc. ("CACI"). CACI is a contractor of the Department of Justice, and as such, conducts business in the District of Columbia.

## JURISDICTION AND VENUE

4.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and this Court has supplemental jurisdiction over plaintiff's common law claims pursuant to 28 U.S.C. § 1367.

5.    Mr. Friend, on behalf of CACI, regularly conducts business in the District of Columbia.

6.    At all times relevant hereto, Mr. Ivarone was employed by CACI, working as a contractor on site at the Department of Justice in Washington, D.C.

7.    Most of the tortious acts alleged to have been engaged in were committed in the District of Columbia.

8.    The amount in controversy in this action exceeds the jurisdictional minimum amount for this Court.

9.    Venue is proper in this district under 28 U.S.C. § 1391(b), as most of the events or omissions giving rise to this action occurred in the District of Columbia.

**BACKGROUND**

10.    Prior to his employment with CACI, beginning on or about August 9, 2001, Mr. Ivarone was employed by Triad Management Systems, Inc. ("TMSI") as a sub-contractor for CACI at the Department of Justice as a Senior Systems Analyst. Mr. Ivarone's immediate supervisor at CACI was Joseph Friend.

11.    On December 3, 2001, Mr. Ivarone was hired by CACI as a full-time staff member, and promoted to the position of Lead Systems Analyst. In this position, Mr. Ivarone continued to work as a CACI contractor for the Department of Justice in Washington, D.C., and Mr. Friend continued to be Mr. Ivarone's immediate supervisor.

12.    In the Summer of 2002, Mr. Ivarone received his first "Certificate of Merit" award for creating, preparing and assisting with the presentation of a case file management system demonstration.

2

13.    In June, 2002, David Andrew ("Mr. Andrew"), Senior Vice President, CACI, and Russell Sullivan ("Mr. Sullivan"), an executive with CACI, granted Mr. Ivarone a "markup bonus" of $500 for his "substantial contributions to the overall team effort."

14.    In August, 2002, Mr. Andrew and Colleen Lurwick ("Ms. Lurwick"), Senior Vice President, CACI, and Mr. Friend's supervisor, granted Mr. Ivarone a markup bonus of $1,000 in "recognition of [his] contributions."

15.    In November 2002, Mr. Andrew and Ms. Lurwick surprised Mr. Ivarone with yet another $1000 bonus, this time for his contributions in capturing new client funding.

16.    On or about December 1, 2002, Mr. Friend wrote a letter to Ms. Lurwick recommending Mr. Ivarone for a promotion to Principal Systems Analyst.

17.    On or about December 2, 2002, Mr. Ivarone received a letter and a distinctive "Encore Achievers Club" pin from Jack London ("Mr. London"), the Chairman, President and CEO of CACI.  Mr. London congratulated Mr. Ivarone on his performance and said Mr. Ivarone's contributions "epitomize[d] CACI's tradition of excellence."  This award was a result of a letter written on behalf of the Department of Justice to CACI.

18.    Mr. Ivarone received his first yearly review on or about December 6, 2002.  Mr. Ivarone's review was conducted by his manager, Mr. Friend.  Mr. Friend rated Mr. Ivarone 4s ("Exceeds Expectations") and 5s ("Superior") in all categories.

19.    In January 2003, Mr. Ivarone received his second Certificate of Merit for providing "outstanding support for the six week APC trial."

20.    Mr. Ivarone received a salary increase and promotion to Principal Systems Analyst effective January 1, 2003.

3

21.    On or about March 14, 2003, Mr. Ivarone received a gift of $100 from CACI for "excellent problem solving."

22.    On or about March 18, 2003, Mr. Ivarone received another $100 gift from CACI, this time for "providing responsive technical support to various projects."

23.    During the April-May 2003 timeframe, upon approval by the Department of Justice (which exemplified the Department of Justice's high regard for Mr. Ivarone), Mr. Ivarone's time was dedicated 100% to the "Spent Nuclear Fuel" case. Mr. Ivarone became the main point of contact for all technical aspects of litigation support for the case, and began to manage all the technical staff and tasks for the case, a role previously held by Mr. Friend.

24.    On or around June 18, 2003, Mr. Ivarone received a $1,750 markup bonus from Mr. Andrew and Ms. Lurwick.

25.    On or about August 29, 2003, Mr. Friend submitted a transfer review to Mark Nast ("Mr. Nast"), who was to become Mr. Ivarone's new manager. The transfer review conducted by Mr. Friend rated Mr. Ivarone 4s ("Exceeds Expectations") and 5s ("Superior") in all categories.

26.    Following Mr. Ivarone's transfer, Mr. Friend became increasingly unhappy with Mr. Ivarone as a result of the recognition Mr. Ivarone was receiving from other management at CACI, because of Mr. Ivarone's superior job performance.

27.    On January 2, 2004, Mr. Ivarone received his yearly review and a salary increase from his new manager, Mr. Nast. The review conducted by Mr. Nast rated Mr. Ivarone 4s ("Exceeds Expectations") and 5s ("Superior") in all categories.

28.    At the review, Mr. Nast told Mr. Ivarone he was being groomed for another

4

promotion in 2005.

29.     When Mr. Ivarone joined CACI, he received an NACI clearance.  In March 2004, Mr. Ivarone received interim Secret clearance, with a continuing investigation toward that clearance.

30.     On or about May 3, 2004, Ms. Lurwick and Rowena Faison ("Ms. Faison"), Director, CACI, awarded Mr. Ivarone a surprise bonus of $800 for Mr. Ivarone's contributions in capturing new client funding.

31.     In September 2004, Ms. Lurwick and Mr. Andrew awarded Mr. Ivarone a surprise bonus of $1,000.00, again for capturing new client funding.

32.     In October 2004, Mr. Ivarone was contacted by Paul Hillhouse ("Mr. Hillhouse"), a recruiter, regarding a job opportunity at Aspen, a competitor of CACI.

33.     Unbeknownst to Mr. Ivarone, Mr. Friend, in furtherance of his anger and jealously of Mr. Ivarone, had contacted Mr. Hillhouse with the hopes of Mr. Hillhouse luring Mr. Ivarone from CACI, because Mr. Friend wanted to "get rid of" Mr. Ivarone, which Mr. Friend later disclosed to Mr. Ivarone.

34.     Mr. Ivarone sent his resume to Mr. Hillhouse in order to find out the salary being offered, but never seriously considered the position, even though the salary offered was higher than what Mr. Ivarone was receiving at CACI.

35.     On or about November 18, 2004, Mr. Ivarone was offered a position with the United States Securities and Exchange Commission ("SEC") to start December 13, 2004.  Mr. Ivarone accepted the SEC position.

36.    On December 4, 2004, the day after his stock options vested, and consistent with CACI practices and policies, Mr. Ivarone gave notice of his resignation from CACI, effective Friday, December 10, 2004.

37.    Following Mr. Ivarone's communication to CACI of his resignation, Mr. Friend came to Mr. Ivarone's office and asked what company Mr. Ivarone would be joining.

38.    There was no business justification for Mr. Friend seeking this information, which Mr. Friend conceded to Mr. Ivarone.

39.    Moreover, Mr. Friend was not Mr. Ivarone's direct report, and it would not have been relevant or appropriate for Mr. Friend to seek any information from Mr. Ivarone on behalf of CACI at this time.

40.    No one at CACI other than Mr. Friend expressed any interest in where Mr. Ivarone was going to work following his resignation at CACI.

41.    Mr. Ivarone responded to Mr. Friend that he would let everyone know his future plans on December 10, 2004, his last day at CACI, as had been Mr. Ivarone's practice at previous employments.

42.    Mr. Friend appeared agitated that Mr. Ivarone would not offer him any information about his future plans, and told Mr. Ivarone that he "would find out anyway."

43.    Less than one hour later, a co-worker told Mr. Ivarone that Mr. Friend had told him that Mr. Ivarone was joining Aspen, a CACI competitor.

44.    During the timeframe of December 6-9, 2004, Mr. Ivarone was told by several other co-workers that they had heard Mr. Ivarone was joining Aspen.

6

45.     On information and belief, Mr. Friend made an announcement in a meeting at which senior Aspen staff, senior Department of Justice staff and senior CACI staff were present, that Mr. Ivarone was joining Aspen.

46.     While employed at CACI, Mr. Ivarone was subject to a covenant not to compete, so Mr. Ivarone, if going to Aspen, would have been violating his covenant not to compete with CACI.

47.     Violation of a covenant not to compete is a violation of law, and would suggest that Mr. Ivarone was incompetent to perform his duties, dishonest, and lacked integrity.

48.     Mr. Friend's communications to CACI and DOJ employees that Mr. Ivarone was leaving CACI to join Aspen, a CACI competitor was false, Mr. Friend knew it to be false, and said communications constituted defamation *per se*.

49.     On the morning of Thursday, December 9, 2004, Mr. Friend visited Mr. Ivarone in his office and again asked Mr. Ivarone what company he was joining. Mr. Ivarone reiterated that he would share his plans the following day, the last day of his employment with CACI.

50.     Mr. Friend continued to press, stating that if Mr. Ivarone was not joining Aspen, it was probably Navigant, another consulting company.

51.     Mr. Friend became agitated, telling Mr. Ivarone he was being unprofessional because Mr. Ivarone "had to tell" management staff his plans. Mr. Ivarone questioned Mr. Friend as to why this would be the case, given that no one on behalf of CACI had asked him such a question, including his immediate supervisor, or Human Resources, and there was no provision in any handbook, policy or procedure of which Mr. Ivarone was aware that required Mr. Ivarone to disclose his place of future employment at that time.

52.    Mr. Friend was unable to provide any response, much less offer a legitimate business justification for Mr. Friend being told of the place Mr. Ivarone was going, prior to Mr. Ivarone's intended announcement.

53.    In fact, Mr. Friend was not in Mr. Ivarone's chain of command, so it made no sense that he was questioning Mr. Ivarone of his employment plans, particularly so persistently.

54.    Mr. Friend, still angry, directed Mr. Ivarone to remove his belongings and leave the premises by noon, or he would call security.

55.    This direction by Mr. Friend to leave at that time or he would call security was not authorized by CACI, or pursuant to any policy or practice of CACI, and Mr. Friend was not in Mr. Ivarone's chain of command.

56.    No one in Mr. Ivarone's chain of command had made any such directive to Mr. Ivarone.

57.    Mr. Friend admitted to Mr. Ivarone that Mr. Friend had been trying to "get [Mr. Ivarone] out of the company for awhile" and in furtherance of Mr. Friend's desire to force Mr. Ivarone out of CACI, had asked his friend, Mr. Hillhouse, to contact Mr. Ivarone with a job opportunity outside of CACI.

58.    Mr. Ivarone was unaware of Mr. Friend's contacting Mr. Hillhouse until Mr. Friend admitted it to him at this time, and was shocked and dismayed that a manager at CACI would engage in such conduct.

59.    Mr. Friend, still visibly angry, stated he would classify Mr. Ivarone as "not eligible for rehire" at CACI.

8

60.    Mr. Ivarone had received excellent reviews and performance evaluations, including by Mr. Friend, during Mr. Ivarone's tenure at CACI.

61.    Mr. Ivarone questioned whether Mr. Friend possessed the authority to classify Mr. Ivarone's departure, since Mr. Friend was no longer Mr. Ivarone's supervisor. Mr. Friend insisted he had the authority to do so.

62.    The classification of Mr. Ivarone as "not eligible for rehire" is defamatory *per se*, as it suggests Mr. Ivarone was not competent to perform his job responsibilities, and lacked integrity.

63.    Mr. Friend knew that his decision to characterize Mr. Ivarone's employment status as "not eligible for rehire" was false, defamatory, and would cause Mr. Ivarone irreparable harm to his reputation and future.

64.    Mr. Friend's statement and characterization that Mr. Ivarone was "not eligible for rehire" was false, misleading, negligent, and done with the sole purpose of inflicting injury upon Mr. Ivarone, and to cause Mr. Ivarone irreparable harm, including to his reputation.

65.    Mr. Friend then ordered Mr. Ivarone to leave the office by 12:00 noon, or else he would call security and be escorted out of the building.

66.    Within minutes of leaving Mr. Ivarone's office, and before noon, Mr. Friend sent an email to select senior Department of Justice staff members (including Dick Roll, head of the Office of Litigation Support at the Department of Justice, and Doug McManus, second-in-command to Mr. Roll at the DOJ) and some CACI staff managers (including Rowena Faison, Executive Vice President, CACI, Mark Nast, Project Manager and Mr. Ivarone's direct supervisor), stating that Mr. Friend found Mr. Ivarone to be a "security threat" to other people in

9

the building and to the network, and requesting that DOJ terminate Mr. Ivarone's ID from the network "immediately."

67.    Mr. Ivarone had done absolutely nothing to justify being labeled as a "security threat," and possessed a secret clearance at the time.

68.    Mr. Friend knew that Mr. Ivarone possessed a security clearance, and that Mr. Ivarone had done nothing to justify Mr. Friend's defamatory publication to DOJ officials and CACI employees.

69.    Mr. Friend knew that in putting in writing to the DOJ officials and CACI employees that Mr. Ivarone was a "security threat" to other persons in the building and on the network, he would jeopardize Mr. Ivarone's reputation and security status for the rest of his life, and would cause significant additional hardship and risk respecting any reputational issues, or security investigation for future clearances, as well as interfere with Mr. Ivarone's security clearances and abilities to be employed for the remainder of his life.

70.    In the era following 9-11, a manager of CACI issuing a written statement to high level persons at the DOJ and CACI, that an employee currently working in the Dept. of Justice building constitutes a security threat is extreme, outrageous, inflammatory, incendiary and highly volatile and threatening to the subject of the accusation, Mr. Ivarone.

71.    The statements that Mr. Ivarone was a security threat, and that Mr. Friend found Mr. Ivarone to be a security threat, are statements suggesting that Mr. Ivarone is incompetent and lacks integrity, and impugns Mr. Ivarone's reputation; therefore these statements and conduct constitute defamation *per se.*

72.    Mr. Friend's conduct was engaged in solely for the purpose of injuring Mr. Ivarone, with malice, negligence and spite, and evincing an intense desire to cause immediate and long-term, irreparable harm to Mr. Ivarone and Mr. Ivarone's reputation.

73.    Mr. Ivarone had just finished reading the email that Mr. Friend sent out to the people set forth in ¶66, when Mr. Friend stormed into Mr. Ivarone's office, angrily told Mr. Ivarone he was no longer allowed to use the computer, Mr. Friend yanked the computer cord of the socket, and directed Mr. Ivarone to leave immediately.

74.    Mr. Friend had unplugged Mr. Ivarone's computer before Mr. Ivarone was able to print out Mr. Friend's false, defamatory, incendiary email.

75.    Mr. Friend yanked the plug out of Mr. Ivarone's computer because he did not want Mr. Ivarone to see the defamatory communication, intending to hide it from Mr. Ivarone, because Mr. Friend knew it was false, defamatory, and incendiary.

76.    Mr. Friend was acting as an employee of CACI at the time of the defamatory communication, and held himself out to the DOJ officials and the CACI employees as someone who possessed the authority to make such a determination on behalf of CACI.

77.    Mr. Ivarone vacated his office as ordered, confused and distressed by the defamatory communications, and because he did not want to suffer further embarrassment and humiliation of being escorted off the premises, which would only lend credence to Mr. Friend's defamatory publication.

78.    Mr. Friend's actions to immediately revoke Mr. Ivarone's I.D. from the network, had the implication of Mr. Ivarone being unable to access the DOJ building or CACI premises.

11

79.    This action by Mr. Friend was done with the intent of lending credibility to his stated, defamatory belief that Mr. Ivarone was a security threat.

80.    Mr. Ivarone did not report to work on Friday, December 10, 2004, on what should have been his last day of employment, since Mr. Friend had ordered him off the premises the preceding day, his I.D. had been removed from the network, and Mr. Ivarone had been humiliated and grossly defamed by being ordered out with a defamatory, incendiary email telling high level officials at the DOJ, as well as CACI employees, that he was a "security threat."

81.    Mr. Ivarone was not given an opportunity to explain his sudden absence to his co-workers or colleagues.   The only record remaining was Mr. Friend's email to DOJ and CACI employees stating that Mr. Ivarone was a security threat, followed by Mr. Ivarone's sudden and unexpected departure, the intended result of Mr. Friend's conduct.

82.    Mr. Ivarone started his new job at the SEC on December 13, 2004.

83.    Sometime between December 10, 2004 and January 4, 2005, Mr. Friend contacted a CACI contractor who worked at the SEC, Ejaz Sahibzada, and "warned him" about Mr. Ivarone, stating that Mr. Ivarone had been escorted out of the building, and further stating and implying that Mr. Ivarone was a threat to CACI security, and that there had been many complaints about Mr. Ivarone from the DOJ.

84.    Mr. Sahibzada communicated to Karen Stewart, Mr. Ivarone's supervisor at the SEC, these statements by Mr. Friend.

85.    Concerned about the seriousness of these statements, Ms. Stewart questioned Mr. Ivarone about these statements, suggesting her concern for Mr. Ivarone's credibility and integrity, and ability to perform his job.

86.    On information and belief, other CACI and SEC employees have heard Mr. Friend's defamatory comments about Mr. Ivarone as a result of Mr. Friend's statements.

87.    Mr. Friend's statements were patently and demonstrably false.

88.    These statements are false and constitute defamation *per se*, as they suggest Mr. Ivarone is incompetent and lacks integrity in his job.

89.    These statements were made with the intent of harming Mr. Ivarone in his new position, and interfering with his job, and further harming his reputation irreparably.

### COUNT ONE – DEFAMATION *PER SE*

90.    The foregoing allegations are incorporated as if realleged herein.

91.    Joseph Friend made false and defamatory statements to employees and/or contractors of CACI, stating to CACI and DOJ employees that Mr. Ivarone was leaving to join Aspen, a competitor, in violation of CACI's non-compete provisions and restrictions it had imposed upon Mr. Ivarone, characterizing and stating that Mr. Ivarone was ineligible for rehire, stating or implying to employees of CACI and DOJ that Mr. Ivarone was a security threat, including to other persons in the building and to the network, and telling CACI employees, DOJ employees and being responsible for communications to SEC employees, that Mr. Ivarone was a security threat to others and to the network, that he had several complaints against him by DOJ employees, and that Mr. Ivarone had to be, or had been, escorted from the CACI building, and stating that he had to "warn" others about Mr. Ivarone, all as set forth in ¶¶ 42-45, 59, 66 and 90 of this Complaint.

92.    Mr. Friend engaged in these materially false and misleading statements knowing the claims were false, defamatory and particularly in the context of the conduct and

13

communications, outrageous and incendiary.

93.    Mr. Friend's conduct constituted defamation *per se*.

94.    Mr. Friend's statements and conduct assert that Mr. Ivarone was unfit to perform the duties of his employment, that he lacked integrity, and that he was a threat to security at the Department of Justice. The effect of Defendant's words was prejudicial to Mr. Ivarone in his reputation and his work.

95.    Any privilege connected to these statements was waived because (a) Defendant knew these statements were false or made these statements with reckless disregard as to whether the statements were false or not; (b) the statements were unnecessarily insulting; (c) the language used was stronger or more violent than was necessary under the circumstances; and/or (d) Defendant made the statements because of hatred, ill-will or a desire to injure Mr. Ivarone, rather than a fair comment on the subject.

96.    Any privilege connected to these statements is overcome by Mr. Friend's malice in making these statements for personal motive of spite, ill-will, negligence and malice, with the intent to irreparably injure Mr. Ivarone.

97.    Mr. Friend repeated these defamatory statements to third parties.

98.    These materially false and misleading statements were made with an intent to harm Mr. Ivarone's reputation for morality, and Mr. Ivarone's reputation, integrity and competency in his employment and profession, and have done so.

99.    Said defamation was made in a reckless and negligent manner with a malicious intent and evinces a conscious disregard for the rights of Mr. Ivarone.

14

100.    As a direct and proximate result of the defamation, Mr. Ivarone has suffered and will in the future suffer great damages, including loss of income, loss of employee benefits, lost career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, damaged reputation, embarrassment, humiliation, inconvenience, severe mental anguish, stress, pain and suffering.

101.    Due to the severity of Mr. Friend's defamatory conduct, Mr. Ivarone is also entitled to punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff JASON D. IVARONE requests that this Court enter judgment in his favor, and against defendant JOSEPH FRIEND as follows:

(a)    Award Mr. Ivarone One Million Dollars ($1,000,000.00) in compensatory damages, plus demonstrated past and future pecuniary damages, or whatever amount may be proven at trial; and in addition

(b)    Award Mr. Ivarone punitive and exemplary damages of One Million Dollars ($1,000,000.00); and in addition

(c)    Award Mr. Ivarone such other and further relief as may be appropriate under the circumstances.

15

## JURY DEMAND

**PLAINTIFF, JASON D. IVARONE, REQUESTS A TRIAL BY JURY.**

December 2, 2005                          Respectfully submitted,

Elaine Charlson Bredehoft
D.C. Bar No. 441525
Kathleen Z. Quill
D.C. Bar No. 489079
CHARLSON BREDEHOFT & COHEN, P.C.
11260 Roger Bacon Drive
Suite 201
Reston, Virginia 20190
(703) 318-6800

Counsel for Plaintiff
Jason D. Ivarone

16