IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JASON D. IVARONE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05ca02322 |
| | ) | Hon. James Robertson |
| JOSEPH FRIEND, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION TO
DISMISS PLAINTIFF'S COMPLAINT AND COMPEL ARBITRATION**

The Plaintiff, Jason Ivarone ("Mr. Ivarone"), by counsel, hereby opposes the Motion to

Dismiss Plaintiff's Complaint and Compel Arbitration of Defendant, Joseph Friend ("Mr.

Friend").

### PROCEDURAL BACKGROUND

This is an action at law arising out of defamation *per se* of Plaintiff by Mr. Friend. Mr.

Ivarone filed his Complaint on December 27, 2005. On January 18, 2006, Mr. Friend sent

Plaintiff a letter requesting that Plaintiff dismiss this Complaint and voluntarily submit the

claims against him to arbitration. In a letter dated January 23, 2006, Plaintiff declined to agree,

and explained his legal basis for declining that request. Mr. Friend filed a Motion to Dismiss

Plaintiff's Complaint and Compel Arbitration on January 27, 2006.

### FACTUAL BACKGROUND

Mr. Ivarone started working for CACI International, Inc. ("CACI") in August 2001

through a subcontractor, Triad Management Systems, Inc. *Complaint* at ¶10. He was hired by

CACI in December 2001 as a full-time staff member. *Id.* at ¶11. From August 2001 until

August 2003, Mr. Ivarone was supervised by Mr. Friend and received positive reviews and much recognition for his excellent work for CACI. *Id.* at ¶¶12-24. In August 2003, Mr. Friend was transferred and began supervision by Mark Nast ("Mr. Nast"). *Id.* at ¶25. The transfer review conducted by Mr. Friend and given to Mr. Nast rated Mr. Ivarone 4s ("Exceeds Expectations") and 5s ("Superior") in all categories. *Id.* at ¶25.

However, following Mr. Ivarone's transfer, Mr. Friend became increasingly unhappy with Mr. Ivarone as a result of the recognition Mr. Ivarone was receiving from other management at CACI, because of Mr. Ivarone's superior job performance. *Id.* at ¶26. On January 2, 2004, Mr. Ivarone received his yearly review and a salary increase from his new manager, Mr. Nast. *Id.* at ¶27. The review conducted by Mr. Nast rated Mr. Ivarone 4s ("Exceeds Expectations") and 5s ("Superior") in all categories. *Id.* at ¶27. At the review, Mr. Nast told Mr. Ivarone he was being groomed for another promotion in 2005. *Id.* at ¶28. Mr. Ivarone continued to receive bonuses and recognition of his excellent performance. *Id.* at ¶¶30-31.

In October 2004, Mr. Ivarone was contacted by Paul Hillhouse ("Mr. Hillhouse"), a recruiter, regarding a job opportunity at Aspen, a competitor of CACI. *Id.* at ¶32. Unbeknownst to Mr. Ivarone, Mr. Friend, in furtherance of his anger and jealously of Mr. Ivarone, had contacted Mr. Hillhouse with the hopes of Mr. Hillhouse luring Mr. Ivarone from CACI, because Mr. Friend wanted to "get rid of" Mr. Ivarone, which Mr. Friend later disclosed to Mr. Ivarone. *Id.* at ¶33. Mr. Ivarone sent his resume to Mr. Hillhouse in order to find out the salary being offered, but never seriously considered the position, even though the salary offered was higher than what Mr. Ivarone was receiving at CACI. *Id.* at ¶34.

On or about November 18, 2004, Mr. Ivarone was offered a position with the United

Case 1:05-cv-02322-JR    Document 5    Filed 02/10/2006    Page 3 of 18

States Securities and Exchange Commission ("SEC") to start December 13, 2004. *Id* at ¶35.

Mr. Ivarone accepted the SEC position. *Id* at ¶35. On December 4, 2004, the day after his stock

options vested, and consistent with CACI practices and policies, Mr. Ivarone gave notice of his

resignation from CACI, effective Friday, December 10, 2004. *Id* at ¶36.

Following Mr. Ivarone's communication to CACI of his resignation, Mr. Friend came to

Mr. Ivarone's office and asked what company Mr. Ivarone would be joining. *Id* at ¶37. There

was no business justification for Mr. Friend seeking this information, which Mr. Friend conceded

to Mr. Ivarone. *Id* at ¶38. Moreover, Mr. Friend was not Mr. Ivarone's direct report, and it

would not have been relevant or appropriate for Mr. Friend to seek any information from Mr.

Ivarone on behalf of CACI at this time. *Id* at ¶39. No one at CACI other than Mr. Friend

expressed any interest in where Mr. Ivarone was going to work following his resignation at

CACI. *Id* at ¶40. Mr. Ivarone responded to Mr. Friend that he would let everyone know his

future plans on December 10, 2004, his last day at CACI, as had been Mr. Ivarone's practice at

previous employments. *Id* at ¶41.

Mr. Friend appeared agitated that Mr. Ivarone would not offer him any information about

his future plans, and told Mr. Ivarone that he "would find out anyway." *Id* at ¶42. Less than

one hour later, a co-worker told Mr. Ivarone that Mr. Friend had told him that Mr. Ivarone was

joining Aspen, a CACI competitor. *Id* at ¶43. During the timeframe of December 6-9, 2004,

Mr. Ivarone was told by several other co-workers that they had heard Mr. Ivarone was joining

Aspen. *Id* at ¶44. On information and belief, Mr. Friend made an announcement in a meeting at

which senior Aspen staff, senior Department of Justice staff and senior CACI staff were present,

that Mr. Ivarone was joining Aspen. *Id* at ¶45. While employed at CACI, Mr. Ivarone was

subject to a covenant not to compete, so Mr. Ivarone, if going to Aspen, would have been

violating his covenant not to compete with CACI. *Id.* at ¶46. Violation of a covenant not to compete is a violation of law, and would suggest that Mr. Ivarone was dishonest, lacked integrity, and reflected on his competency to perform his duties. *Id.* at ¶47. Mr. Friend's communications to CACI and DOJ employees that Mr. Ivarone was leaving CACI to join Aspen, a CACI competitor was false, Mr. Friend knew it to be false, and said communications constituted defamation *per se*. *Id.* at ¶48.

On the morning of Thursday, December 9, 2004, Mr. Friend visited Mr. Ivarone in his office and again asked Mr. Ivarone what company he was joining. *Id.* at ¶49. Mr. Ivarone reiterated that he would share his plans the following day, the last day of his employment with CACI. *Id.* at ¶49. Mr. Friend continued to press, stating that if Mr. Ivarone was not joining Aspen, it was probably Navigant, another consulting company. *Id.* at ¶50. Mr. Friend became agitated, telling Mr. Ivarone he was being unprofessional because Mr. Ivarone "had to tell" management staff his plans. *Id.* at ¶51. Mr. Ivarone questioned Mr. Friend as to why this would be the case, given that no one on behalf of CACI had asked him such a question, including his immediate supervisor, or Human Resources, and there was no provision in any handbook, policy or procedure of which Mr. Ivarone was aware that required Mr. Ivarone to disclose his place of future employment at that time. *Id.* at ¶51. Mr. Friend was unable to provide any response, much less offer a legitimate business justification for Mr. Friend being told of the place Mr. Ivarone was going, prior to Mr. Ivarone's intended announcement. *Id.* at ¶52. In fact, Mr. Friend was not in Mr. Ivarone's chain of command, so it made no sense that he was questioning Mr. Ivarone of his employment plans, particularly so persistently. *Id.* at ¶53.

Mr. Friend, still angry, directed Mr. Ivarone to remove his belongings and leave the premises by noon, or he would call security. *Id.* at ¶54. This direction by Mr. Friend to leave at

that time or he would call security was not authorized by CACI, or pursuant to any policy or practice of CACI, and Mr. Friend was not in Mr. Ivarone's chain of command. *Id.* at ¶55. No one in Mr. Ivarone's chain of command had made any such directive to Mr. Ivarone. *Id.* at ¶56. Mr. Friend admitted to Mr. Ivarone that Mr. Friend had been trying to "get [Mr. Ivarone] out of the company for awhile" and in furtherance of Mr. Friend's desire to force Mr. Ivarone out of CACI, had asked his friend, Mr. Hillhouse, to contact Mr. Ivarone with a job opportunity outside of CACI. *Id.* at ¶57. Mr. Ivarone was unaware of Mr. Friend's contacting Mr. Hillhouse until Mr. Friend admitted it to him at this time, and was shocked and dismayed that a manager at CACI would engage in such conduct. *Id.* at ¶58. Mr. Friend, still visibly angry, stated he would classify Mr. Ivarone as "not eligible for rehire" at CACI. *Id.* at ¶59.

Mr. Ivarone had received excellent reviews and performance evaluations, including by Mr. Friend, during Mr. Ivarone's tenure at CACI. *Id.* at ¶60. Mr. Ivarone questioned whether Mr. Friend possessed the authority to classify Mr. Ivarone's departure, since Mr. Friend was no longer Mr. Ivarone's supervisor. *Id.* at ¶61. Mr. Friend insisted he had the authority to do so. *Id.* at ¶61. The classification of Mr. Ivarone as "not eligible for rehire" is defamatory *per se*, as it suggests Mr. Ivarone was not competent to perform his job responsibilities, and lacked integrity. *Id.* at ¶62. Mr. Friend knew that his decision to characterize Mr. Ivarone's employment status as "not eligible for rehire" was false, defamatory, and would cause Mr. Ivarone irreparable harm to his reputation and future. *Id.* at ¶63. Mr. Friend's statement and characterization that Mr. Ivarone was "not eligible for rehire" was false, misleading, negligent, and done with the sole purpose of inflicting injury upon Mr. Ivarone, and to cause Mr. Ivarone irreparable harm, including to his reputation. *Id.* at ¶64.

Mr. Friend then ordered Mr. Ivarone to leave the office by 12:00 noon, or else he would call security and be escorted out of the building. *Id.* at ¶65. Within minutes of leaving Mr. Ivarone's office, and before noon, Mr. Friend sent an email to select senior Department of Justice staff members (including Dick Roll, head of the Office of Litigation Support at the Department of Justice, and Doug McManus, second-in-command to Mr. Roll at the DOJ) and some CACI staff managers (including Rowena Faison, Executive Vice President, CACI, Mark Nast, Project Manager and Mr. Ivarone's direct supervisor), stating that Mr. Friend found Mr. Ivarone to be a "security threat" to other people in the building and to the network, and requesting that DOJ terminate Mr. Ivarone's ID from the network "immediately." *Id.* at ¶66. Mr. Ivarone had done absolutely nothing to justify being labeled as a "security threat," and possessed a secret clearance at the time. *Id.* at ¶67.

When Mr. Ivarone joined CACI, he received an NACI clearance. In March 2004, Mr. Ivarone received interim Secret clearance, with a continuing investigation toward that clearance. Mr. Friend knew that Mr. Ivarone possessed a security clearance, and that Mr. Ivarone had done nothing to justify Mr. Friend's defamatory publication to DOJ officials and CACI employees. *Id.* at ¶68. Mr. Friend knew that in putting in writing to the DOJ officials and CACI employees that Mr. Ivarone was a "security threat" to other persons in the building and on the network, he would jeopardize Mr. Ivarone's reputation and security status for the rest of his life, and would cause significant additional hardship and risk respecting any reputational issues, or security investigation for future clearances, as well as interfere with Mr. Ivarone's security clearances and abilities to be employed for the remainder of his life. *Id.* at ¶69. In the era following 9-11, a manager of CACI issuing a written statement to high-level persons at the DOJ and CACI, that an employee currently working in the Dept. of Justice building constitutes a security threat is

6

extreme, outrageous, inflammatory, incendiary, highly volatile, and threatening to the subject of the accusation, Mr. Ivarone. *Id.* at ¶70. The statements that Mr. Ivarone was a security threat, and that Mr. Friend found Mr. Ivarone to be a security threat, are statements suggesting that Mr. Ivarone is incompetent and lacks integrity, and impugns Mr. Ivarone's reputation; therefore these statements and conduct constitute defamation *per se. Id.* at ¶71.

Mr. Friend's conduct was engaged in solely for the purpose of injuring Mr. Ivarone, with malice, negligence and spite, and evincing an intense desire to cause immediate and long-term, irreparable harm to Mr. Ivarone and Mr. Ivarone's reputation. *Id.* at ¶72. Mr. Ivarone had just finished reading the email that Mr. Friend sent out to the people when Mr. Friend stormed into Mr. Ivarone's office, angrily told Mr. Ivarone he was no longer allowed to use the computer, Mr. Friend yanked the computer cord of the socket, and directed Mr. Ivarone to leave immediately. *Id.* at ¶73. Mr. Friend had unplugged Mr. Ivarone's computer before Mr. Ivarone was able to print out Mr. Friend's false, defamatory, incendiary email. *Id.* at ¶74. Mr. Friend yanked the plug out of Mr. Ivarone's computer because he did not want Mr. Ivarone to see the defamatory communication, intending to hide it from Mr. Ivarone, because Mr. Friend knew it was false, defamatory, and incendiary. *Id.* at ¶75.

Mr. Ivarone vacated his office as ordered, confused and distressed by the defamatory communications, and because he did not want to suffer further embarrassment and humiliation of being escorted off the premises, which would only lend credence to Mr. Friend's defamatory publication. *Id.* at ¶77. Mr. Friend's actions to immediately revoke Mr. Ivarone's I.D. from the network, had the implication of Mr. Ivarone being unable to access the DOJ building or CACI premises. *Id.* at ¶78. This action by Mr. Friend was done with the intent of lending credibility to his stated, defamatory belief that Mr. Ivarone was a security threat. *Id.* at ¶79.

Mr. Ivarone did not report to work on Friday, December 10, 2004, on what should have been his last day of employment, since Mr. Friend had ordered him off the premises the preceding day, his I.D. had been removed from the network, and Mr. Ivarone had been humiliated and grossly defamed by being ordered out with a defamatory, incendiary email telling high level officials at the DOJ, as well as CACI employees, that he was a "security threat." *Id.* at ¶80. Mr. Ivarone was not given an opportunity to explain his sudden absence to his co-workers or colleagues. *Id.* at ¶81. The only record remaining was Mr. Friend's email to DOJ and CACI employees stating that Mr. Ivarone was a security threat, followed by Mr. Ivarone's sudden and unexpected departure, the intended result of Mr. Friend's conduct. *Id.* at ¶81.

Mr. Ivarone started his new job at the SEC on December 13, 2004. *Id.* at ¶82. Sometime between December 10, 2004 and January 4, 2005, Mr. Friend contacted a CACI contractor who worked at the SEC, Ejaz Sahibzada, and "warned him" about Mr. Ivarone, stating that Mr. Ivarone had been escorted out of the building, and further stating and implying that Mr. Ivarone was a threat to CACI security, and that there had been many complaints about Mr. Ivarone from the DOJ. *Id.* at ¶83. Mr. Sahibzada communicated to Karen Stewart, Mr. Ivarone's supervisor at the SEC, these statements by Mr. Friend. *Id.* at ¶84. Concerned about the seriousness of these statements, Ms. Stewart questioned Mr. Ivarone about these statements, suggesting her concern for Mr. Ivarone's credibility and integrity, and ability to perform his job. *Id.* at ¶85. On information and belief, other CACI and SEC employees have heard Mr. Friend's defamatory comments about Mr. Ivarone as a result of Mr. Friend's statements. *Id.* at ¶86.

## SUMMARY OF ARGUMENT

The Arbitration Clause between CACI and Mr. Ivarone, upon which Mr. Friend is attempting to piggyback to assert his "right" to arbitration, states as follows:

> Any controversy or claim arising out or, or relating to this Agreement, or its breach, or otherwise arising out of or relating to [Mr. Ivarone's] recruitment by, employment with, or termination of employment with, CACI ... will be settled first by resort to mediation by CACI's Ombudsman and then, if mediation fails to resolve the matter, by arbitration.

CACI Employee Agreement at 2, ¶13. A plain reading of the Complaint suggests that on its face, the Arbitration clause does not apply, as Mr. Friend's conduct does not arise out of the Employment Agreement, Mr. Ivarone's recruitment, employment or termination of employment. The defamation all took place after Mr. Ivarone had tendered his resignation. Further, the defamatory conduct took place from the point after Mr. Ivarone tendered his resignation, up through and including the time Mr. Ivarone was employed at his new place of employment. While it is a jury issue to determine whether Mr. Friend, who is no longer employed by CACI, was acting within or outside his scope with respect to each specific act of defamation, Mr. Friend has not presented any aspect of his burden of proof at this stage.

Moreover, Mr. Friend, who is no longer employed by CACI, is not a party to the Employment Agreement, there is no evidence that Mr. Ivarone or Mr. Friend intended that Mr. Friend be included as a party to the arbitration clause of the contract, Mr. Friend possesses no privity upon which to rely, is not subject to the jurisdiction or enforcement of any judgment by an arbitrator, and the claims arise out of conduct following the resignation of Mr. Ivarone.

Finally, there is no applicable or controlling law supporting Mr. Friend's position. Mr. Ivarone has a Seventh Amendment right to a jury trial by his peers on issues of controversy between man and man. The tort of defamation *per se* is uniquely one that should be tried before

a jury to assess the presumed damages to Mr. Ivarone's reputation. Mr. Friend provides no

compelling reason to depart from time honored Constitutional rights afforded to our citizens.

Mr. Ivarone properly brought his action against Mr. Friend in the appropriate forum. Mr.

Friend's motion should be denied.

## ARGUMENT

**I.    Mr. Friend, a Former Employee of CACI, is Not a Party to the Agreement and there is No Evidence the Parties Intended that Mr. Friend Benefit from the Contractual Terms between CACI and Mr. Ivarone**

"The Supreme Court and [the DC] Circuit have repeatedly held that a party can not be

compelled to arbitrate a dispute that it has not contractually agreed to arbitrate." *DSMC, Inc. v.*

*Convera Corp.*, 273 F. Supp. 2d 14, 28 (D.D.C. 2002); *see also EEOC v. Waffle House, Inc.*, 122

S. Ct. 754, 764 (U.S. 2002) ("It goes without saying that a contract cannot bind a nonparty.").

While Mr. Friend correctly identifies the liberal federal policy favoring arbitration, ultimately, an

agreement to arbitrate is a contract that must be enforced according to its terms and as to the

parties of that contract. Accordingly, courts "look first to whether the parties agreed to arbitrate

a dispute, not to general policy goals, to determine the scope of the agreement." *Id.* at 764 ("we

do not override the clear intent of the parties, or reach a result inconsistent with the plain text of

the contract, simply because the policy favoring arbitration is implicated"); *see also Prima Paint*

*Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (U.S. 1967) ("As the 'saving clause' in §

2 indicates, the purpose of Congress in 1925 was to make arbitration agreements as enforceable

as other contracts, but not more so.") Further, nothing in the Federal Arbitration Act ("FAA")

authorizes a court to compel arbitration of any issues, or by any parties, that are not already

covered in the agreement. *Id.* at 762. Mr. Friend, who is no longer employed by CACI, is not a

party to the agreement to arbitrate, has no privity of contract, and has provided no basis or

authority to suggest that he would be subject to the jurisdiction of arbitration proceedings.
Moreover, Mr. Ivarone has not agreed that he would arbitrate any claims against Mr. Friend and
did not contemplate such a consequence in executing an Employment Agreement with CACI.

The deprivation of the Constitutional right to a jury trial cannot be compromised where
there is no clear intent to waive such a right. There is no evidence that Mr. Ivarone intended to
waive his right to pursue tort claims against a former employee for actions taken after Mr.
Ivarone's resignation from CACI, which included actions long after Mr. Ivarone had ceased any
relationship with CACI. By the same token, there is not a shred of evidence that Mr. Friend
intended to be bound by the Employment Agreement between Mr. Ivarone and CACI. If one
reversed this example – if Mr. Friend had desired to sue Mr. Ivarone because of some tort Mr.
Ivarone committed against Mr. Friend – there is nothing in the Ivarone/CACI Agreement that
suggests Mr. Friend could bring an action in arbitration and that it would be binding. Where
there is no authority to bind Mr. Friend, as is evident here, Mr. Ivarone would potentially be left
with no legal remedy against Mr. Friend if this Court dismisses this action. This is also not the
intended result of CACI or Mr. Ivarone in executing the agreement to arbitrate their disputes.

Mr. Friend is not a party, the agreement does not apply on its face, there is no jurisdiction
by AAA over Mr. Friend, Mr. Friend has not demonstrated any compelling reason to depart from
the United States Constitution and the Seventh Amendment in this action, and there is no
evidence Mr. Friend and Mr. Ivarone intended to be bound by arbitration for the actions included
in this Complaint.

**II.    Section 4 of the FAA is not a Valid Basis for Compelling Arbitration**

In favor of its argument to compel arbitration, Mr. Friend cites to Sections 3 and 4 of the

FAA. However, in *DSMC Inc. v. Convera Corp.*, 349 F.3d 679 (D.C. Cir. 2003), the DC Circuit

has strongly suggested that a non-signatory to an arbitration agreement cannot compel a

signatory to arbitrate its claims against the non-signatory. Specifically, the DC Circuit found that

any motion to compel arbitration was not one appropriately made under Title 9 U.S.C. § 4

because there was no written agreement to arbitrate between the plaintiff and the non-signatory

as required by the Section 4 of the FAA. *Id* at 683-84 ("There is no issue referable to arbitration

under an agreement in writing between Convera and DSMC because there is no arbitration

agreement between those two parties."); *see also* 9 U.S.C. § 4 ("A party aggrieved by the alleged

failure, neglect, or refusal of another to arbitrate under a <u>written agreement</u> for arbitration may

petition any United States district court which, save for such agreement, would have jurisdiction

under Title 28 ....") (emphasis added). "Section 4 does not merely require that there be a written

agreement somewhere in the picture." *Id.* at 683. It requires that the person seeking to compel

arbitration be a party to that written agreement. *Id* ("'The statute has no application to 'issues'

in cases between different parties.'") (*quoting IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d

524, 529 (7th Cir. 1996)). Section 4 of the FAA does not apply when the motion is based upon a

non-signatory's "effort to expand [a signatory's] obligation *beyond* the terms of that written

agreement." *See id.* (finding that when a party tries to expand a signatory's obligation based

upon equitable estoppel principles, such motion does not fall within Section 4 of the FAA)[1]

---

[1]    The DC Circuit, therefore, found that it did not have jurisdiction to review the lower court's
decision not to compel arbitration under Section 16 of the FAA. *Id*

Accordingly, since there is no written agreement between Mr. Ivarone and Mr. Friend, Section 4 does not permit or require arbitration, as it addresses only written agreements between parties.

### III.    Section 3 of the FAA is not a Valid Basis for Staying or Dismissing this Case

Mr. Friend moves for a stay of this case, and further dismissal of this case, based upon Section 3 of the FAA. However, the DC Circuit in DSMC further found that even if arbitration could be compelled between a non-signatory and a signatory under the theory put forth in that case, "the litigation may not be stayed under *Section 3* because the issues in the litigation are not 'referable to arbitration under an agreement.'" *Id.* at 684 (*quoting* 9 U.S.C. § 3); *see also Adams v. Georgia Gulf Corp.*, 237 F.3d 538, 540 (5th Cir. 2001) ("The denial of the benefit of the mandatory stay provision to non-signatories has been grounded in the recognition that non-signatory's litigation with an arbitrating party cannot be referred to arbitration."). Because there was no arbitration agreement between the non-signatory defendant and the signatory plaintiff, the DSMC Court concluded "that the mandatory stay provision of Section 3 does not apply to litigation involving parties not subject to a written arbitration agreement...." *Id.* Similarly, Mr. Friend cannot invoke the mandatory stay provision of Section 3 in favor of his motion to stay or his motion to dismiss based upon an arbitration agreement to which he is not a party.

### IV.    Mr. Friend Cites No Support for Compelling Arbitration in this Case

Mr. Friend has neither contractual support, nor statutory support, for his assertion that the claims against him must be submitted to arbitration. As stated above, he is not a party to the contract he cites requiring arbitration and neither Section 3 nor Section 4 of the FAA are applicable. Furthermore, Mr. Friend is unable to cite any binding or persuasive cases supporting his motion to compel arbitration with Mr. Ivarone.

A.    Courts in the DC Circuit have not Previously Compelled Arbitration of Disputes
      Between a Non-Signatory Employee and a Signatory Employee

"While it is clear that a non-signatory can not be compelled to arbitrate a claim, neither

the Supreme Court nor [the DC] Circuit have directly addressed the issue of whether a willing

non-signatory to an arbitration agreement can compel a signatory to arbitrate its claims against

the non-signatory." *DSMC,* 273 F. Supp. 2d at 28.  However, the DSMC Court interpreted

"dicta in the Supreme Court's decision in *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*

460 U.S. 1, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983), [to] support[] the holding that such

arbitration can not be compelled." *Id.*  Mr. Friend fails to cite even one case in which a court

compelled a plaintiff-employee to arbitrate his claims against another employee based upon an

arbitration provision contained in a contract between that plaintiff-employee and his employer,

let alone any binding DC Circuit cases.   Rather, Mr. Friend cites cases which are not controlling

authority and which involve facts and circumstances not apposite to this case. *See* Motion to

Dismiss and Compel Arbitration at 12, *citing International Paper Co. v. Schwabedissen,*

*Maschinen & Anlagen GMBH,* 206 F.3d 411 (4th Cir. 2000) (holding plaintiff purchaser

compelled to arbitrate against manufacturer based upon contract between manufacturer and

distributor on which the plaintiff's rights hinged); *Thomson-CSF, S.A. v. American Arb. Ass'n,*

64 F.3d 773 (2d Cir. 1995) (reversing lower court's decision to compel non-signatory to

arbitrate, involving all corporate parties); *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, 7*

*F.3d 1110* (3d Cir. 1993) (compelling arbitration in stockholder-broker relationship); *Arnold v.*

*Arnold Corp.,* 920 F.2d 1269, 1281-82 (6th Cir. 1990) (same) [2]

---

[2]  Furthermore, there is no indication that courts in the DC circuit would be persuaded by cases
outside this district. *See DSMC,* 273 F. Supp.2d at 29-30 (recognizing that, although DC Circuit
had never addressed whether a court can compel a party to an arbitration agreement to arbitrate
with a non-signatory on the basis of equitable estoppel, other circuits have so recognized, but

B.     *Hughes* is not Binding or Persuasive

The only other support Mr. Friend offers for his position is vague *dicta* in *Hughes v.*
*CACI, Inc.*, 384 F.Supp.2d 89 (D.D.C. 2005), which states in a footnote that a claim against the
individual defendants in that case could not be maintained because "Title VII applies to
employers only." *Hughes*, 384 F.Supp.2d at 92 n.2. The Hughes Court goes on to hypothesize
that "any additional claims the plaintiff may wish to file against the CACI employees are
encompassed by the broad arbitration agreement…." *Id.* This statement, upon which Mr.
Friend is evidently attempting to rely, is *dicta* relating to the specific claims in that instance,
which are not the same claims as alleged against Mr. Friend by Mr. Ivarone. In fact, no
discrimination-related claims are alleged at all, only one count of common law defamation. That
*dicta* is not binding on this Court. Further, it is not even clear that this issue was briefed or
before the Hughes Court. Mr. Friend cites no other case that even suggests that the District of
Columbia Federal Court would hold an employee bound by an arbitration clause that he did not
sign.

The Hughes Court cites *Brick v. J.C. Bradford & Co.*, 677 F.Supp. 1251 (D.D.C. 1987) in
support of its statement in *dicta*. However, Brick involves a very different relationship than that
of the employment relationship. Brick involves the relationship between a customer and a
brokerage firm and that brokerage firm's employees. Although the Brick Court ultimately finds
that, on the facts of that case, the individual defendants could invoke the arbitration clause, it
recognizes a disagreement in the District of Columbia District Courts as to whether the
brokerage firm's employees can invoke an arbitration clause between the brokerage firm and its

---

denying the non-signatory's motion to compel nevertheless).

customer. Id. at 1257. It therefore appears that even in the brokerage firm arena, the law is
unsettled.

C.      Even if the *Brick* Reasoning Applies, Mr. Friend was
        not Clearly Acting within the Scope of his Employment

Even if the reasoning of Brick were applicable in this case, Mr. Friend would still not be

able to invoke the arbitration clause. The Brick Court found that because the plaintiff clearly

understood that the individual defendants were acting in their capacities as representatives of the

brokerage firm, that the state law claims against these individual representatives were subject to

the arbitration clause. *Id.* However, Mr. Friend's role, as described in the allegations contained

in the Complaint, are not necessarily such actions as would have been in his capacity as a

representative of CACI. The complaint alleges that Mr. Friend defamed Mr. Ivarone both while

Mr. Ivarone was employed by CACI and after his employment with CACI. Such defamatory

conduct was not necessarily done in his capacity as a representative of CACI, and was not likely

to have been done in that capacity after Mr. Ivarone's departure. In any event, it is not Mr.

Ivarone's burden of proof whether the conduct was within or outside the scope of employment at

this stage, and he is entitled to plead in the alternative, and permit the facts to be brought out in

discovery as to whether this is the case.[3] This is not a situation in which a customer goes to a

company for services, speaks with representatives of that company, and then sues the company

---

[3]Mr. Friend cites *Gina Chin & Assocs. v. First Union Bank*, 260 Va. 533, 541, 537 S.E.2d 573,
577 (2000) for the proposition that Virginia courts focus their inquiry as to scope of employment
on "'whether the service itself, in which the tortious act was done was within the ordinary course
of such business.'" Motion to Dismiss and Compel Arbitration at 11. *Gina Chin* also states that
the answer to that inquiry is a factual finding to be made by a jury and that one factor in
determining the answer to this inquiry is the motivation of the employee. *Id.* at 543-544, 537
S.E.2d at 578. Accordingly, this is a factual issue, which cannot be determined on a motion to
dismiss (or to compel arbitration), when all factual allegations plead are taken as true. *See Holy
Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003).

and its representatives for a problem with those services. Mr. Friend personally directed

defamatory comments about Mr. Ivarone to third parties, both within and outside of CACI.

Mr. Friend, a non-signatory to the arbitration agreement, therefore, has no legal basis for

compelling Mr. Ivarone to arbitrate his claims against Mr. Friend.

**V.      Claims of Defamation are Not Arbitrable under the Employment Agreement**

Finally, even if Mr. Friend could invoke the Arbitration Clause, it would not apply to the

case at hand [4] The Arbitration Clause states:

> Any controversy or claim arising out or, or relating to this Agreement, or its breach, or
> otherwise arising out of or relating to [Mr. Ivarone's] recruitment by, employment with, or
> termination of employment with, CACI ... will be settled first by resort to mediation by
> CACI's Ombudsman and then, if mediation fails to resolve the matter, by arbitration.

CACI Employee Agreement at 2, ¶13. Mr. Ivarone's claim that Mr. Friend defamed him,

particularly to his new employer, is not related to his employment agreement with CACI or his

employment with CACI. On the contrary, the defamatory statements relate to Mr. Ivarone's

leaving his employment with CACI and going to work for a new employer and to Mr. Friend's

attempts to sabotage Mr. Ivarone's professional future.

## CONCLUSION

Mr. Friend, a former employee of CACI, engaged in tortious conduct against Mr. Ivarone

that spanned the time period after Mr. Ivarone's resignation, up through and including Mr.

---

[4]  Mr. Friend cites ¶ 13 to assert that this Court should not decide if it will compel arbitration of
Mr. Ivarone's claims against Mr. Friend. Motion to Dismiss and Compel Arbitration at 6-7. Of
course, this begs the question of whether Mr. Friend has the right to assert or rely upon any
provision in the Agreement, since he is not a party, the parties did not intend him to be a party
and the claims against Mr. Friend are outside the parameters of the agreement. *First Options v.
Kaplan*, 514 U.S. 938, 944 (1995), as cited by Defendant, does not address or support Mr.
Friend's assertion. Instead, this portion of paragraph 13 of the Employment Agreement explains
why Mr. Ivarone has submitted his claim of defamation against CACI to arbitration even though
such claim may not be subject to arbitration pursuant to the Employment Agreement, rather than
Defendant's assertions to the contrary. *See* Motion to Dismiss and Compel Arbitration at 10. Mr.
Ivarone has also submitted his claim of negligent retention against CACI to arbitration.

Ivarone's employment with the SEC. Mr. Friend is not a party to the CACI/Ivarone Arbitration Agreement, there is no evidence Mr. Friend or Mr. Ivarone intended to be bound to arbitration for these types of claims, there is no privity by Mr. Friend, and there is nothing raised by Mr. Friend that should compel this Court to deprive Mr. Ivarone of his Constitutional right to a jury trial.

The <u>Hughes</u> decision is neither binding on this Court, nor particularly persuasive to the case at hand. As Mr. Friend states in his motion, before this Court can compel arbitration, it "must decide whether the parties entered into a valid and enforceable arbitration agreement." Motion to Dismiss and Compel Arbitration at 7 (*citing Hughes*, 384 F.Supp 2d at 95). In this instance, the parties, Mr. Ivarone and Mr. Friend, DID NOT enter into a valid and enforceable arbitration agreement. *See DSMC*, 349 F.3d at 683-84. The Court's inquiry should, accordingly end there. Mr. Ivarone should not be compelled to arbitrate claims he has with Mr. Friend when he and Mr. Friend never entered into any agreement to do so.

For the reasons set forth above, Plaintiff requests this Court deny Defendants' Motion to Dismiss and Compel Arbitration.

February 10, 2006

Jason D. Ivarone,
By Counsel

Elaine Charlson Bredehoft
D.C. Bar No. 441425
Kathleen Z. Quill
D.C. Bar No. 489079
CHARLSON BREDEHOFT & COHEN, P.C.
11260 Roger Bacon Drive
Suite 201
Reston, Virginia 20190
(703) 318-6800